IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division



OCT 1 9 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

HENH CHU NGO,               )
                           )
        Petitioner          )
                           )
    v.                      )     1:12cv74 (LMB/IDD)
                           )
GREGORY HOLLOWAY, Warden, Wallens  )
Ridge State Prison,         )
                           )
        Respondent.         )
                           )

## MEMORANDUM OPINION

Before the Court is the petition of Henh Chu Ngo ("Ngo"), a
Virginia inmate proceeding through counsel, for a writ of habeas
corpus under 28 U.S.C. § 2254. Ngo argues that due to the
ineffectiveness of his trial counsel, his convictions for murder
and using a firearm in the commission of a felony in the Circuit
Court of Fairfax County, Virginia, violated the United States
Constitution and should be vacated.[1] The matter has been fully
briefed, and is now ripe for decision. For the reasons that
follow, Respondent's Motion to Dismiss will be granted, Ngo's
petition will be dismissed, and his requests for discovery and
an evidentiary hearing will be denied.

---

[1] The petition also includes requests for discovery and for an
evidentiary hearing.

A. Procedural History

At trial, Ngo was represented by Peter Greenspun and Jonathan Shapiro, of the firm Greenspun Shapiro P.C. The trial rested primarily on the credibility of two eyewitnesses, Phuc Nguyen ("Phuc") and Hoan Minh Le ("Le"), who testified that they saw Ngo shoot their friend Ngoc Quy Doan Nguyen ("Quy") outside a pool hall in Annandale, Virginia, on the evening of December 27, 2002. Although defense counsel vigorously cross-examined Phuc and Le, several other witnesses corroborated portions of their testimony, including police officers who testified to the statements that Phuc and Le gave immediately after the shooting, which were very similar to Phuc and Le's trial testimony.

Trial counsel objected repeatedly on hearsay grounds to the admission of some of that testimony, particularly early in the trial, when Officer Cooper summarized his interview with Phuc. The trial court overruled those defense objections twice, admitting the testimony as Phuc's prior consistent statement. Later, counsel did not object to similar testimony from Officer Ellis about Le's earlier statements or to opening testimony from Detective Allen about Phuc and Le's earlier identification of Ngo. But counsel did raise a final hearsay objection to some of Detective Allen's testimony regarding the details of Le's

2

account of the shooting. That objection was also overruled by the trial court.

On March 23, 2006, a jury convicted Ngo of murder and of using a firearm in the commission of a felony. Pet. for a Writ of Habeas Corpus ("Pet."), at 2; Br. in Supp. of Mot. to Dismiss and Rule 5 Answer ("Resp."), at 1. He was sentenced to a term of imprisonment of 23 years on the murder charge and three years on the firearm charge. Id.

Ngo appealed his convictions to the Virginia Court of Appeals, arguing that the trial court erred in admitting into evidence the out-of-court statements made by Phuc and Le to Officer Cooper and Detective Allen shortly after the shooting. See Ngo v. Commonwealth, No. 1671-06-4, slip op. at 1 (Va. Ct. App. June 17, 2008). On appeal, the Commonwealth conceded that the trial court erred in admitting the police officers' hearsay testimony regarding what Phuc and Le told them. The Court of Appeals nevertheless upheld the convictions after finding that any error was harmless:

> Since no forensic evidence linked appellant to the murder and Phuc and Le, the only eyewitnesses to identify appellant as the shooter, were friends of [the victim] and members of a rival gang, it cannot be said that the evidence of guilt was overwhelming. Thus, in order for us to conclude the error was harmless, the evidence admitted in error must be found to be merely cumulative of other, undisputed evidence. Here, Phuc and Le testified without objection that

3

appellant was the shooter in this case. Detective Allen's testimony that they identified appellant as the shooter in a photo lineup was also admitted without objection, as was Detective Ellis's testimony that Le told him appellant was the shooter. It follows that the detectives' challenged hearsay statements that Phuc and Le identified appellant as the shooter were merely cumulative of other undisputed evidence. Thus, any error in the admission of the evidence was harmless.

Id. at 2. The Virginia Supreme Court denied Ngo's petition for appeal. Ngo v. Commonwealth, No. 082065 (Va. Mar. 10, 2009), reh'g denied (Va. Apr. 24, 2009).

Ngo timely filed a state habeas corpus petition alleging ineffective assistance of counsel, including a letter dated May 5, 2010, from Jonathan Shapiro, one of his trial attorneys, who stated that "the failure to object to the improper 'prior consistent' testimony was my oversight" and "was not done as part of any strategy." Pet. at 30. Ngo's petition was denied. Ngo v. Commonwealth, No. CL-2010-6101, slip op. at 5 (Va. Cir. Ct. May 18, 2011). In its final order, the state court found that Ngo's ineffective assistance claim failed because:

Although counsel failed to object to the inadmissible hearsay at each instance in which it was offered, the error was not prejudicial to the defense. This court finds that there is no reasonable probability that, but for counsel's error, the result of the proceeding would have been different. There was substantial evidence of the petitioner's guilt, including two eyewitnesses who testified they saw the petitioner, who was well known in the community, shoot the victim.

4

The eyewitnesses' testimony was corroborated by other evidence in addition to the hearsay evidence that was erroneously admitted.

Id. at 3-4. Ngo appealed the trial court's decision to the Virginia Supreme Court, which denied his petition for appeal in a brief order stating that "the Court is of opinion there is no reversible error in the judgment complained of." Ngo v. Commonwealth, No. 111512 (Va. Oct. 27, 2011). On January 25, 2012, Ngo filed the instant federal claim.

B. Factual Background

The Commonwealth's case at trial rested primarily on two eyewitnesses to the shooting, Phuc and Le, both of whom were believed to be members of the Asian Young and Dangerous ("AYD") gang. Trial Tr. 3/21/06 ("Tr. II"), at 194-196. From the very beginning of the trial, defense counsel attempted to discredit Phuc and Le. For example, in their opening statement defense counsel described the eyewitnesses as "[f]riends" of the victim and not being "forthright with the police." Trial Tr. 3/20/06 ("Tr. I"), at 126, 129. Counsel pointed to the witnesses' gang affiliation and reluctance to "talk[] to the police about what happened." Id. at 130. Counsel also stressed that the witnesses' accounts of the crime were inconsistent "with each other" and with earlier statements they had made, and that they were predisposed to identify Ngo as the shooter because they

5

believed he might be angry at them after "they or their friends" had viciously attacked Ngo a week earlier. Id. at 130-31.

Phuc was the Commonwealth's first witness. He testified that on December 27, 2002, he, Le, and Quy were approached outside the Happi Billiards pool hall in Annandale, Virginia, by two men who asked if they were members of AYD. Id. at 137-38. Phuc denied membership, and he, Le, and Quy got into Quy's car. Id. at 138. As Quy pulled the car out of the parking space, he realized that he had left his glasses in the pool hall. Id. at 138-39. He stopped the car, ran into the pool hall to retrieve the glasses, and left Phuc and Le sitting in the car. Id.

According to Phuc, while Quy was in the pool hall, petitioner Ngo approached the car, knocked on the front passenger side window near where Phuc was seated, and asked Phuc to lower the window. Id. at 139-41. Phuc refused to lower the window because he was suspicious of the fact that one of Ngo's hands was hidden inside his jacket. Tr. I. at 140. As Quy returned to the parking lot, Ngo turned to Quy and asked him, "Are you AYD?" Id. After a brief exchange, Ngo shot Quy in the head before firing two more shots through the car's windshield. Id. at 140-41.

When police arrived minutes later, Phuc identified Ngo as the shooter by his street name, "Phi Lu," and pointed him out in

a photograph array. Id. at 144-45, 204-05. He told police that Ngo was in a gang called Asian Dragon Family ("ADF") and that he knew "what [Ngo] looked like" because he had seen him three times before, including once when Ngo "was chasing" one of Phuc's friends in an incident earlier in 2002. Id. at 145-49. Phuc described Ngo as a "pretty big" male with a tattoo. Id. at 146, 203. Phuc was also able to identify other individuals who had been on the scene that night, some of whom he had seen with Ngo before. Id. at 205-06. Though he denied being a member of AYD, Phuc said he was aware that AYD members had "jumped" Ngo at Springfield Mall about a week before the shooting, and that he had expected trouble on the night of the shooting. Id. at 166, 171, 176, 197.

Phuc was cross-examined vigorously on his testimony that he heard the exchange between the shooter and Quy. Phuc repeated that he could hear the shooter ask Quy, "Are you AYD," and Quy respond in the negative before he was shot. Id. at 188. Defense counsel then impeached Phuc by introducing his tape-recorded statement to police and a transcript of his testimony during a preliminary hearing to show that Phuc had stated on other occasions that he could only hear Quy and the shooter having a verbal exchange but was not "really sure what they said." Id. at 191-93.

After Phuc testified, the Commonwealth called police officers who corroborated elements of his testimony. For example, Lieutenant Richard Perez and Officer Chad Ellis testified that they had responded to an incident in Annandale on October 6, 2002, slightly more than two months before Quy's murder, in which "somebody was chasing another individual," both Phuc and Ngo had been present, and Ngo was "the largest person" at the scene. Id. at 208-09, 212-14. Officer Matthew Mackenzie testified that on the night of the shooting, he saw two bullet holes in the windshield of Quy's car, three shell casings in front of the car, and an unconscious victim, whom an expert in forensic pathology testified died from a gunshot wound to the head. Id. at 216-19, 230, 233. Officer Christopher Johnson testified that Quy was declared dead at Fairfax Hospital the morning after the shooting. Id. at 227.

Defense counsel objected strenuously to the corroborating testimony of Officer Curtis Cooper, who had interviewed Phuc directly after the shooting and was asked to repeat Phuc's statements during that interview. Id. at 237. Mr. Greenspun objected to the government's questions on the ground that the Commonwealth was "attempting to bolster and impeach a witness through hearsay statements." Id. at 240. The Commonwealth responded that the testimony was admissible as a prior

consistent statement, and the court agreed, overruling the objection. Id. at 239-40.

Before Officer Cooper could relate Phuc's statements about the shooter, the defense again objected and requested a bench conference. Id. at 240. Mr. Greenspun argued that the impending statements were inadmissible because they would only be "a rehashing of the prior testimony." Id. at 240-43. Co-counsel Shapiro elaborated that Phuc "wasn't confronted with a statement inconsistent with that so I don't think this falls into the category of any previous consistent statement." Id. at 244. The court again overruled the objection, explaining that it viewed the statements as prior consistent statements that were not offered to prove the truth of their content but rather their relevance to Phuc's credibility. Id. at 241-44. The trial court also issued a limiting instruction to the jury, warning that "this next testimony that's going to be elicited from Officer Cooper, . . . it's not being elicited for the truth of what Mr. Phuc Nguyen told him but just as it might affect your determinations about Mr. Nguyen, the gentleman who testified previously today; your determination of his credibility." Id. at 245. Officer Cooper then testified that at the police station, Phuc gave a chronology of the events leading up to the shooting. That chronology was similar to his

9

trial testimony. Specifically, Officer Cooper testified that Phuc told him that after Quy left to retrieve his glasses, "Philu" approached the car with his hand inside his jacket, tapped on Phuc's window, and Phuc heard three gunshots and saw people fleeing the scene. Id. at 246-47.

The second eyewitness, Le, testified to similar events leading up to the shooting. According to Le, a group of people had gathered outside the pool hall, and when Quy left his car to retrieve his glasses, Ngo approached the car with one hand in his jacket and tapped on Phuc's window. Tr. II at 25-27. When Quy returned, Ngo had a brief exchange with him before pulling out a gun, shooting Quy, and firing two more shots through the car's windshield. Id. at 28-29. Le described Ngo as "[h]eavy," weighing about "two hundred-something, three hundred [pounds]," and said that Ngo was a member of ADF, was nicknamed Phi Lu, and had a dragon tattoo on his arm. Id. at 25-31. Le identified Ngo in the courtroom as the shooter, stating that he knew "for sure it was him" and that Ngo was the same person he had described to police. Id. at 31-32.

On cross-examination, Le affirmed that he had not discussed the case with Phuc, although the two were friends and traveled together to court. Id. at 42-43. Defense counsel also asked Le if he had ever made different statements to police about his

gang membership. Id. at 38. Le conceded that he had initially
denied being a member of AYD because he was "scared [he] would
get in trouble if [he] was in a gang," but had admitted his gang
membership in later discussions with police. Id. at 38-39. In
response to further questions about whether he had been
"evasive" with police, Le explained that he initially did not
want to answer questions because he "was nervous" and "[a]ll in
my head was like my friend is dying, that's it." Id. at 61-62.
Le did admit that immediately after the shooting, but before the
police arrived, he called two AYD members named Tiny and Tony
and told them that Phi Lu had just shot Quy; however, neither of
those individuals testified at trial. Id. at 58-61, 66-67.

Le was also cross-examined as to whether he recalled making
a statement to police that he had not made at trial, concerning
the shooter asking Quy, "Why did your people jump me," and Quy
replying, "I wasn't involved at the Springfield Mall shooting."
Id. at 63. Le admitted that on the night of the crime, he
"didn't pay attention to what they were saying," but he did not
deny that he had made different statements to police. Id.

After Le's testimony, the Commonwealth called Officer Ellis
and Detective David Allen, both of whom had interviewed Le after
the shooting. Officer Ellis was asked to testify to "what [Le]
communicated" during the interview. Id. at 88. Defense counsel

11

did not object to this line of questioning. Id. Officer Ellis recalled that Le had described how he and Phuc were waiting in a car while Quy retrieved his glasses when a "big guy" named Phi Lu approached their car, exchanged words with Quy about having been jumped at Springfield Mall, and pulled out a gun and shot Quy before firing two more shots at the car. Id. at 89-92.

Defense counsel also did not object to the first few statements Detective Allen made on the stand, when he recalled that both Phuc and Le said that Phi Lu was the shooter and that "there were several people [on the scene] who knew . . . that Henh Chu Ngo was, in fact, Phi Lu." Id. at 169. Detective Allen then said that Phuc and Le had independently identified Ngo as the shooter from a photograph array. Id. at 171-73. Although defense counsel objected to this testimony, they did not appear to do so on hearsay grounds. Id.; see Pet. at 9.

After Detective Allen's initial testimony, defense counsel objected to the admission of Le's other statements to Detective Allen about the shooter. Tr. II at 173. Counsel reiterated that the Commonwealth was improperly "trying to bolster the testimony of their own witness by this officer's description of what the witness said." Id. at 173-74. The Commonwealth replied that the testimony qualified as a prior consistent statement. Id. at 174. Once again, the trial court overruled

12

the objection and instructed the jury that the testimony was
"not being admitted for the truth of those statements, but just
how it might affect your determination of Mr. Le's credibility
in that he related the events to Detective Allen as the
Detective has just testified."  Id. at 176.

        Detective Allen's account of Le's statement was very
similar to Le's direct testimony.  Specifically, he testified
that Le told him that after Quy ran inside the pool hall to get
his glasses, a "large gentleman" named Phi Lu knocked on the car
window and attempted to speak with Phuc and Le, and that as Quy
returned, the man walked around the car, asked Quy if he was a
member of AYD, and then shot Quy one time and fired two more
shots at the car's windshield.  Id. at 174-75.  On cross-
examination, Detective Allen elaborated that Le had specifically
described the shooter as "six-two, 250 to 260 [pounds], chubby,
might have been wearing glasses, and he had a tattoo of a dragon
or a tiger on one of his arms."  Id. at 200.

        The Commonwealth called several other witnesses who
corroborated aspects of Phuc and Le's testimony.  Master Deputy
Sheriff Dwight Greer testified that as he processed Ngo into
jail he saw that Ngo had a dragon tattoo on his right arm and a
tiger tattoo on his left arm.  Id. at 75.  Detective Leonard
Cordick documented three cartridge casings on the pavement in

front of Quy's vehicle, bullet fragments in the vehicle and in Quy's remains, and two bullet holes in the vehicle's windshield indicating that the shooter fired a gun twice from outside the vehicle into the windshield. Id. at 123, 128, 131-34, 136-37. An expert forensic scientist testified that the three casings had all been fired from one handgun and that the bullet fragments were consistent with those casings. Id. at 227, 229, 232-33.

After the Commonwealth rested, the defense moved to strike on the grounds of "inherently incredible testimony, particularly from the two eyewitnesses." Id. at 235-36. Specifically, counsel argued that Phuc's continued denial and Le's initial denial of gang membership made them less credible given the government's stipulation that law enforcement had beliefs to the contrary. Id. at 236. The defense also asserted that there were "vast inconsistencies, between each of their testimonies, not just internally, but one from the other," citing Phuc's statement that he could hear dialogue between Ngo and Quy outside the car when he had made no such statement at the preliminary hearing. Id. at 236. The Commonwealth responded that the two eyewitnesses gave similar accounts, were familiar with Ngo's appearance from prior interactions, and had credibly

identified him as the shooter.  Id. at 239.  The trial court

denied the defense's motion to strike.  Id. at 240.

## II.    DISCUSSION

### A. Standard of Review

When a state court has passed on the merits of a claim

raised in a federal habeas petition, as the state court has done

here, a federal court may grant a habeas petition only if the

state court's decision is "contrary to, or involved an

unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States," or if the

decision is "based on an unreasonable determination of the

facts."  28 U.S.C. § 2254(d).  This standard is "highly

deferential" and "difficult to meet."  Cullen v. Pinholster, 131

S. Ct. 1388, 1398 (2011) (quoting Woodford v. Visciotti, 537

U.S. 19, 24 (2002) (per curiam); Harrington v. Richter, 131 S.

Ct. 770, 786 (2011)) (internal quotation marks omitted).

Under the "unreasonable application" clause, "a federal

habeas court may grant the writ if the state court identifies

the correct governing legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts

of the prisoner's case."  Williams v. Taylor, 529 U.S. 362, 413

(2000).  Whether a state court's application of federal law is

15

"unreasonable" must be determined using an objective standard. <u>Id.</u> at 409-10.

In evaluating whether a state court's determination of the facts is unreasonable, a federal court "presume[s] the [state] court's factual findings to be sound unless [petitioner] rebuts the 'presumption of correctness by clear and convincing evidence.'" <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(e)(1)); <u>see, e.g.</u>, <u>Lenz v. Washington</u>, 444 F.3d 295, 300-01 (4th Cir. 2006).

B. <u>Analysis</u>

Ngo argues that his trial counsel provided ineffective assistance by failing to object to hearsay that improperly "bolstered" the testimony of Phuc and Le.

To establish ineffective assistance of counsel, Ngo must show both that (1) "counsel's performance was deficient" and that (2) "the deficient performance prejudiced the defense." <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). Deficient performance occurs when "counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 688. Such a determination "must be highly deferential" with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> at 689.

16

To establish prejudice, Ngo must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A showing that "the errors had some conceivable effect on the outcome of the proceeding" is not enough; a reasonable probability requires that the errors are "sufficient to undermine confidence in the outcome." Id. at 693-94. In short, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

Ngo concedes that the state court's decision was not contrary to clearly established federal law because it identified Strickland as controlling, but he argues that its decision was based on an unreasonable determination of the facts and an unreasonable application of clearly established federal law. Pet. at 20. Neither of these arguments has merit.

1. Unreasonable Determination of the Facts

Ngo argues that the state court's decision was based on an unreasonable determination of the facts because, in finding no prejudice under Strickland, the state court referred to "substantial evidence of the petitioner's guilt, including two eyewitnesses," and stated that "[t]he eyewitnesses' testimony was corroborated by other evidence in addition to the hearsay

evidence" provided by the police officers who took their statements. Pet. at 20-21.

Ngo has not presented clear and convincing evidence to rebut the presumption that these factual determinations were sound. The substantially similar testimony of Phuc and Le alone could have constituted "substantial evidence" of Ngo's guilt, especially given the trial court's rule on witnesses and the lack of any evidence that the two witnesses had discussed their testimony with one another.[2]

The record also shows that Phuc and Le's testimony was corroborated by details offered by a variety of other witnesses. For example, the cartridge casings, bullet holes, and bullet fragments found on the scene corresponded to Phuc and Le's accounts of how and where the shots were fired. Officer Greer's observation that Ngo had a dragon tattoo on his arm corroborated Phuc and Le's descriptions of Ngo, as did the recollections of Lieutenant Perez and Officer Mackenzie that Phuc and Ngo were present together at the incident earlier in 2002 to which Phuc had referred. Officer Mackenzie's memory that Ngo was "the largest person" on the scene of that incident also supported Phuc and Le's description of the shooter as a "[h]eavy," "big

---

[2] At the outset, the trial court directed "anyone who's going to be a witness in this case" to "remain outside the courtroom" and not to "discuss your testimony with anyone, even among yourselves, until it's your turn to testify." Tr. I at 117.

guy" weighing between two and three hundred pounds.  Tr. I at
203, 214; Tr. II at 31, 200.

## 2. Unreasonable Application of Federal Law

Ngo argues that his trial lawyers were constitutionally
ineffective because they failed to object to some (but not all)
testimony from police officers regarding what Phuc and Le told
them during interviews directly after the shooting.[3]  Because
this argument was adjudicated on a complete factual record in
state court, it must be reviewed through "the 'doubly'
deferential lens of [§2254(d)] and Strickland."  Jackson v.
Kelly, 650 F.3d 477, 496 (4th Cir. 2011); see also Pinholster,
131 S. Ct. at 1403.

This Court need not reach the issue of deficient
performance to uphold the state habeas court's denial of Ngo's
petition because Ngo has failed to establish prejudice from the
allegedly deficient performance.  See McHone v. Polk, 392 F.3d
691, 704 (4th Cir. 2004) ("If [petitioner] fails to demonstrate

---

[3] Ngo's original petition for habeas corpus referred to counsel's
failure to object to both the testimony of Officer Ellis, who
related statements made by Le, and Detective Allen, who related
statements made by Phuc and Le.  See Pet. at 7.  Ngo's latest
filing appears to narrow his claim only to the failure to object
to the testimony of Officer Ellis, stating "the bolstering
testimony of Officers Cooper, Ellis and Allen was improper and
inadmissible, but trial counsel failed to object to the
testimony of Officer Ellis," which alone "violated Ngo's Sixth
Amendment right to the effective assistance of counsel."
Pet'r's Resp. to the Dir.'s Notice, at 3.  Nevertheless, the
Court will address petitioner's original, broader argument.

sufficient prejudice from certain acts or omissions, we need not decide whether counsel's performance in those respects was, in fact, deficient under Strickland.").

A showing of prejudice requires a "reasonable probability" that Ngo would have been acquitted if not for counsel's errors. Strickland, 466 U.S. at 694. Here, the record shows that any objections to the testimony of Officer Ellis or Detective Allen would have been futile. Before those two officers testified, defense counsel had already been overruled twice on similar hearsay objections, and after Phuc and Le's statements were admitted, counsel objected to other out-of-court statements and was overruled a third time. On each occasion, the trial court admitted the testimony as prior consistent statements, evidently viewing the defense to have impeached Phuc and Le sufficiently to have triggered that hearsay exception. Any suggestion that the trial court would have dealt differently with objections to other testimony about what the eyewitnesses told police after the shooting plainly contradicts the record.

Even if defense counsel had objected to Officer Ellis and Detective Allen's testimony and the trial court had sustained the objections, the only statements that would have been excluded were Le's statement to Officer Ellis describing the basic events leading up to the shooting and Phuc and Le's

statements to Detective Allen identifying Ngo from a photograph array as the shooter with the alias "Phi Lu." Both of these pieces of evidence mirrored evidence that was already admitted, supplied by Phuc and Le and bolstered by Officer Cooper's testimony about Phuc's interview.

Ngo argues that exclusion of this repetitive testimony would have changed the outcome of his trial by dispelling an imprimatur of credibility that corroboration by police officers provides, but Ngo overlooks the fact that Phuc's credibility had already been bolstered by the admission of the statement he gave to Officer Cooper, to which trial counsel strenuously but unsuccessfully objected. The similarity of Phuc and Le's testimony provided powerful evidence of credibility, as did the fact that Phuc and Le's accounts did not conflict with the forensic investigation or with descriptions of Ngo as a heavy-set male with a dragon tattoo. The defense also did not dispute eyewitness testimony that Ngo was nicknamed "Phi Lu" and belonged to the rival gang ADF. On this record, there is no reasonable probability that Ngo would have been acquitted had counsel objected to the admission of the challenged statements because the trial court would have overruled the objection as it had done with similar objections. Thus, Ngo's petition fails to meet the Strickland standard for prejudice.

### III. CONCLUSION

For the reasons stated above, Respondent's Motion to Dismiss will be granted, Ngo's petition will be dismissed, and Ngo's requests for discovery and for an evidentiary hearing will be denied by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 19th day of October, 2012.

Alexandria, Virginia

_____ /s/ _____
Leonie M. Brinkema
United States District Judge